Katzenbach *v.* Holt.

FRANK S. KATZENBACH and HOWELL C. STULL, partners trading as Katzenbach & Co.,

*v.*

WOODBURY D. HOLT et al.

1. Unless circumstances control, when witnesses are equally entitled to credit, the greater number must control.

2. Katzenbach & Co. held a mechanics lien on the premises of Holt; Manning had a mortgage thereon which was subsequent; Holt said to Katzenbach & Co. that if they would release their lien, Manning would take a new mortgage for a larger amount, and would endorse for Holt, and that he would pay that part of their lien still in book account, in cash, and that part in notes, as they became due, out of the money which he would receive by such mortgage and endorsements; the release was made and delivered; Manning had made such promise to Holt as Holt represented to Katzenbach & Co.; but Manning, after receiving said mortgage, and endorsing for Holt to an amount equal to the book account, refused to endorse further.—*Held,* that Katzenbach & Co. were entitled to the benefit of the promise of Manning, and that, unless he so endorsed, he would be enjoined from pleading such release to an action at law on the lien claim.

3. Katzenbach & Co. inquired of two of the officers of the bank to which Holt was very largely indebted, and for which Manning was liable as endorser, respecting· Holt's standing, and were induced to believe that he was in good condition; this bank then expected to accommodate Holt still more, on the endorsement of Manning. Shortly after the execution of the release and the mortgage, the bank did so accommodate Holt with Manning's endorsement, and in a few days after the last loan procured an assignment of the mortgage from Manning as collateral; the bank officers admit that, when they talked to Katzenbach & Co. of Holt's ability to meet his engagements, they knew that he was embarrassed.—*Held,* that the bank cannot plead such release, both because of the absence of good faith and valuable consideration.

On bill, answers and proofs.

Mr. *James Buchanan* and Mr. *John R. Emery*, for complainants.

Mr. *W. D. Holt*, *pro se*, and for the First National Bank of Trenton.

Mr. *James S. Aitkin*, for A. V. Manning.

Mr. *G. D. W. Vroom*, for C. B. Bennett and others.

Mr. *B. B. Hutchinson*, for defendant West.

Bird, V. C.

This bill is filed to restrain the defendants from setting up a release of a lien claim to an action at law, brought upon such lien claim for the purpose of enforcing it against the real estate and premises described in the bill, and upon which real estate the said Manning took a mortgage for $60,000, given to secure the payment of a bond for that amount, which mortgage he assigned to the defendant the First National Bank. The allegation in the bill is that the said release was procured under such circumstances that the defendants should not be permitted to set it up in the said action at law. At the time of the execution of the release there were numerous lien claims upon the said land and premises, amounting in all to over $25,000. At that time Mr. Manning was already liable on Mr. Holt's paper as endorser to the amount of about $30,000, and had taken as security therefor a mortgage upon the said premises to the amount of $30,000, and a chattel mortgage upon all the furniture in the building on said premises. At that time, or very shortly before, he had as other security the title to real estate in the city of Trenton, and in the county of Hunterdon, in which, according to Mr. Holt's testimony, there was an equity of $15,000 to $20,000. This title had been conveyed to Mr. Manning by Mr. Holt, by first conveying the title to all of the said premises to his brother, William Holt, who conveyed it to Mr. Manning. None of these conveyances was recorded; neither was the chat-

tel mortgage, nor the mortgage for $30,000 upon the said prem-
ises upon which the said lien is now sought to be enforced.   At
the time of the execution of the release the building was not
wholly completed; and it seemed to be necessary that a large
amount of money should be secured, in order to effect its comple-
tion and the successful management of it; it having been at that
time opened and occupied as a hotel in the city of Trenton, under
the name of the Hotel Windsor.   It appears that Mr. Manning
was unwilling to become liable any further upon the paper of Mr.
Holt, unless the latter would procure the release of the lien
claims which had been filed, and which had priority on said
building and lands; he was willing, in case said liens should be
released, to accept a mortgage including the amount for which he
had already become liable as endorser, and for which he might
thereafter become liable as such endorser.

The allegation of the bill, and the insistment of counsel, are
that the proof shows that Mr. Holt, in order to procure the
complainants to release their lien, said to them that if they
would do so he would pay them, in cash, the amount of certain
notes, which had theretofore been given and which had not yet
matured, when they should mature, out of certain moneys which
he expected to raise by the endorsement of Mr. Manning to the
amount of $30,000; and this is the basis upon which the com-
plainants rest their claim.   The question therefore is, Did they
release upon the understanding that Mr. Holt had a promise
from Mr. Manning that, if the lien claimants would release their
liens, and he (Holt) would give him a mortgage to secure the
amount of the liens, he (Manning) would endorse to that amount;
and upon the further promise of Mr. Holt that he would pay
them the amount of their account, and would pay the notes held
by them, or in the bank, against him, as they should become due,
out of the money so to be raised by Mr. Manning's endorsement?
Mr. Holt procured a release from each of the lien holders before
he asked Katzenbach & Co. to release.   To one of these he paid
the amount due in full; another he paid over sixty per cent.;
another over fifty per cent.   On July 14th, 1885, Katzenbach
& Co. filed their lien for $5,800.   This they afterwards released

upon the payment to them thereon of $2,500 by way of a check, all of which perhaps had not yet been paid. It is insisted, upon the part of the complainants, that they were misled and deceived by Mr. Holt, and also by the bank officers, in this transaction, so that they are not bound by the release which was then executed and delivered to Mr. Holt, upon the strength of which release Mr. Manning accepted a mortgage for $60,000 and made additional endorsements for Mr. Holt, amounting in all to $12,500, or it may be to $15,000.

What was the agreement between Mr. Holt and the complainants at the time of the execution of the release? The complainants both very distinctly say that Mr. Holt said to them, in the interview, that Mr. Manning had promised him that if he would get the lien claims released, he would endorse for him, beyond what he had already endorsed, to the amount of $30,000, and that out of the money so secured he would pay the amount that was due to the complainants on book account, and would pay the notes which they had against him as they became due. The only material difference between the complainants and the defendant Holt is as to the payments of the notes out of the money that was to be so raised by Mr. Manning's endorsements. Mr. Holt admits that he was to pay them as they came due, but insists that he did not say that they were to be paid out of the money to be raised by Mr. Manning's endorsements. Mr. Stull says that Mr. Holt said to him:

" That he was going to effect a loan which would clear him of his indebtedness, and that he would be all right; that was the substance of his conversation at that time."

The witness was not sure whether this was at the first or a subsequent interview; but upon the next day, the 23d of January, 1885, the day that the release was signed, he says Mr. Holt called upon him and stated what he proposed to do:

"That he was going to effect a loan to the amount of $30,000; that Mr. Manning had agreed to loan him $30,000 on the building, provided he could get those lien claims satisfied; * * * he agreed to settle our claim, that

is, the amount of our claim then, excepting notes that would become due, and they were to be taken care of as they fell due, out of this $30,000."

The witness says the amount of notes then due was about $3,000.

Mr. Katzenbach says that in his interview with Mr. Holt upon the subject, Mr. Holt said :

" He had not been able to raise any money upon permanent loan, but expected to get $50,000 or $60,000; and not being able to pay six per cent., or even five per cent., he would have to get the mechanics to release their lien claims in order to tide him over until he could make a permanent loan ; he said that Mr. Manning would take a mortgage of $30,000 on the hotel, if he would get the lien claimants to release their lien claims."

That was on the first interview with Mr. Holt.  Mr. Katzenbach further states that, upon the day of executing the release, Mr. Holt said :

" That he was, for the present, embarrassed for money; that he needed to raise a large amount of money; that Mr. Manning had kindly agreed to loan him $30,000 on the hotel; if he could get that money to pay these lien claims, and pay off these notes as they matured, he would be in good shape, and that in about a year he would be out of debt; that the hotel was running nicely, and that it would soon be making money; it was during the legislative season, and the hotel was doing well; I asked him what there was ahead of this $30,000, and he told me that there was $39,000 ahead of it; that the $39,000 and the $30,000 would make $69,000 on the hotel, I said, and he said yes."

On cross-examination Mr. Katzenbach was asked :

" Q. Was there to be any change in these notes, only their being met when matured ?

" A. You said you would take care of these notes when they matured ; yes, sir.

" Q. So far as you understood it, there was to be no further security for those notes than you had already held, was there ?

" A. Except that you told me that you would pay them out of this money that you got from Mr. Manning."

As I read the testimony of these witnesses, I cannot conjecture how it is that they speak of $30,000, rather than the amount of

Katzenbach *v.* Holt.

all the lien claims, or the amount of their own claim, unless that sum ($30,000) was the subject of conversation between them and Mr. Holt. If their statements had no foundation in fact, then it seems to me that their minds would more readily and reasonably have fallen upon some one of the other sums talked of.

When asked to state what passed, Mr. Holt says:

"Among my other creditors who furnished materials were Katzenbach & Co., and I talked the matter over with them; I said to them that Mr. Manning would become accommodation endorser for the purpose of obtaining a sufficient amount of money to pay the amount that would necessarily have to be raised to pay these creditors a certain sum, and that the balance I could pay off as time progressed, by asking for renewals until such time as I could make a permanent loan; I believe I explained to them that I had been unable, up to that point, to make a permanent loan, but that I believed I could; I remember particularly, in my interview with Mr. Katzenbach and Stull, I distinctly stated to them the amount I was to pay each individual creditor who had a right of lien in those transactions; I don't think I ever referred to Mr. Kenzie, or to the Philadelphia party, who afterwards filed a lien; * * * the principal discussion between Mr. Katzenbach, Mr. Stull and myself was as to the amount they should receive upon the execution of the release; they insisted that the amount was to be paid to them, and the amount of their claim that was to be left unpaid upon that release was out of proportion to what the others left, and the amount they received; but the amount was finally agreed upon, and the release was executed as they described; * * * Mr. Stull and Mr. Katzenbach are certainly both in error when they say that I talked to them, or said to them that Mr. Manning would furnish me $30,000 with which to pay off my indebtedness; the sum of $30,000 was not mentioned or talked of between them and myself in that connection; nor did I ever say anything to Mr. Manning about furnishing $30,000; nor did I ever ask him to furnish any other definite sum."

And, to give probability to this last statement, Mr. Holt says:

"To the amount of that mortgage, never, to Mr. Manning nor to any other person, before I arrived in New England, and had it executed [he went there to have his wife execute it], did I ever say a word; the question as to the amount was a question of my own judgment, a question of my own convenience."

Upon cross-examination, he said:

"Nothing whatever beyond the fact that he was to endorse; he [Manning]

was to endorse, so that I would have enough to pay all the creditors, who had released their liens, so much as I had agreed to pay them if they released, not including that amount of their claims which they agreed to carry without the right of mechanics lien."

Here then is the duty of disposing of a disputed point so often presented in courts of justice. The law has wisely determined the duty of a judge in every such case. He is to be guided by the preponderance of testimony, whether that testimony be direct and positive in its nature upon the one side or upon the other, or direct and circumstantial. In the case before me the witnesses who have testified may be regarded as equally credible. It may be said, too, that their interest or bias is equal. Where then is the preponderance? Upon the part of the complainants are the complainants themselves, testifying that Mr. Holt said to them that Mr. Manning had promised to endorse for him, or that he expected to raise, through Mr. Manning, $30,000, and that out of that $30,000 he would pay not only the amount which was due to them upon their book account at that time, but would also pay the notes which they held against him as they became due. Mr. Holt, upon the other hand, denies this last part of the statement. So far, therefore, as the preponderance of the testimony, considering the number of witnesses testifying, is to govern, it is with the complainants. Are there any circumstances in the case which strengthen the view taken by Mr. Holt? After the most careful examination of the facts which are admitted, I am unable to discover any such circumstance. If there be any circumstances in the case bearing upon this branch of it, in my judgment, they favor and strengthen the view insisted upon by the complainants, rather than otherwise. I advert to only two. It appears that, when Mr. Katzenbach went to the officer of the bank in which Mr. Holt was interested as a depositor, and as a debtor to the amount of about $30,000 at that time, and made inquiries respecting Mr. Holt's condition, stating why he made the inquiries, he adverted to the fact that Mr. Holt told him he expected to get the amount of $30,000 through Mr. Manning with which to make these payments. It is also insisted that, shortly after the release was executed, and when Mr.

Holt was so much embarrassed that he called a meeting of his creditors to confer with them, he said to them that if Mr. Manning had kept his promise in making endorsements he would not have been in such difficulties. Two witnesses swear to this, while Mr. Holt and another deny it. Gen. Rusling says that, on the 4th of February, twelve days after the execution of the release, Mr. Holt told him that he had executed a mortgage to Mr. Manning for $60,000 to secure all his creditors, including himself.

On the day of the execution of the release, Mr. Holt invited the complainants to dine with him and Mr. Manning in the Hotel Windsor. They did so, but they did not make any inquiries of Mr. Manning respecting his promise to endorse for Mr. Holt to the extent of $30,000. And this is said to be strong proof that Mr. Holt could not have said that Mr. Manning had made any such promise. It does not so impress me. It presents itself to me as high proof of the confidence which the complainants had in the veracity and integrity of Mr. Holt. And it will be observed that this train of reasoning applies to what Mr. Holt admits saying, viz., that Mr. Manning would endorse for him to an amount sufficient to pay what was immediately necessary to procure the release. They accepted Mr. Holt's word to that extent. If they could believe him in part, why not in all? Again, their abiding trust in Mr. Holt was shown in the fact that, on that very day, they surrendered to him the release, upon the offer by Mr. Holt of his check for $2,500, with the information that he had not then the funds to meet it, they thus taking all the risk in case of misfortune, in case it should happen that Mr. Manning should endorse without notice of the complainants' rights. But, it is said, the complainants called on the bank officers and made inquiries, which they would not have done had Mr. Holt assured them that Mr. Manning had promised to endorse to an amount sufficient to pay the notes of complainants. I am unable to draw any such conclusion from such inquiries. They did not question any one concerning Mr. Holt's truthfulness, but concerning his probable ability to fulfill his promises. A very great many men as prudent and,

at the time, as able as any engaged in this litigation, have made promises which disasters have prevented them from performing.

To these statements of the witnesses, and to these circumstances, should be added the statement of General Rusling that Mr. Holt told him, on February 4th (twelve days after the delivery of the release), that he had executed a mortgage to Mr. Manning for $60,000 to secure all his creditors, himself included.  Mr. Holt denies this.

These statements and circumstances inevitably lead me to the conclusion that Mr. Holt promised what complainants say he did, or else that there was no binding agreement made.

The next important question in the cause is, Did Mr. Manning promise to endorse for Mr. Holt to the extent of $30,000, or to an amount sufficient to pay the book account of the complainants, and the amount of the notes which they held against him as such notes should mature?  And, if he did make such promise, ought he, in equity, to be restrained from availing himself of the release which was procured from the complainants?  As a witness, when spoken to with reference to his agreement to advance Mr. Holt any sum of money in case the release should be procured, Mr. Manning said:

"I do not remember that there was any amount like that [$30,000] claimed, but I agreed to assist him, and endorse for him sufficient in amount to satisfy those lien claims, or a certain portion of them.

"Q. Had you agreed to advance to him the sum of $30,000 on mortgage of the Hotel Windsor, if he would get the lien claims released, including the claims of Katzenbach & Co.?

"A. Not all at once; not any definite amount.

"Q. Had you agreed to give him $30,000 at different times?

"A. Mr. Holt told me that he thought he would come out on $30,000, and, in order to get a certain amount from a certain endorsement, he would want me to endorse for him, and he would give me this mortgage as collateral until he could raise a certain amount of money to pay off all these claims against him.

"Q. Did you agree to advance him $30,000 for the purpose of paying off these claims?

"A. More or less of them.

"Q. $30,000—did you agree to give him more than that?

"A. If I found it necessary to give him more than $30,000, otherwise this release would not have been made; he had not sufficient to satisfy these

claims; he told me he would get me the release, and secure me beyond doubt.

" *Q.* Then you agreed to advance him an amount sufficient to pay off all claims upon this property if he would get the release?

" *A.* I don't know that there was any particular sum."

He says that he understood that the $30,000 would be sufficient to pay off the lien claims.   Again he says:

" In the first place, I advanced Mr. Holt—I agreed to advance Mr. Holt— the amount of $12,000; I had already endorsed for Mr. Holt; at the time the release was signed, he wanted a certain amount of money sufficient to make certain payments to these mechanics; he said he would have to have some endorsements; he does not remember the amount that he wanted; on the day that the release was signed, he says he endorsed for him $12,500; and that this money he had to have on that day to satisfy the lien claimants; and that he agreed to advance him the money for that purpose."

He also says that Mr. Holt told him that he would come out at about $30,000.   When speaking of another branch of the question, Mr. Manning throws some light upon this, by his own evidence.   When asked why he stopped endorsements, he said:

" Well, really, I don't know; I think that is all the endorsements he wanted; that is my recollection; the reason I did not endorse, I presume, was on account of some trouble with General Rusling.

" *Q.* In your examination last week you say that Mr. Holt told you he would come out at about $30,000; that he wanted $30,000 to clear off everything?

" *A.* That was his first calculation."

Again he says:

" Mr. Holt intimated to me at one time, before I had endorsed as much as I had, that he thought he would get along if he had $30,000.

" *Q.* More than he had?

" *A.* No, altogether; that was before the release was signed; I had been endorsing for him, and he had secured me, I think, beyond any doubt; I think I remember that he stated that he wanted $30,000 to get the building in shape, so that he could get a loan on the building.

" *Q.* That would pay off all the building contracts?

" *A.* I presume so, yes, sir."

And he again repeats this same conviction, saying that his

35

impression was that Mr. Holt told him he would get along with about $30,000 to complete the building, so that he could get this loan.

"*Q.* If he could get $30,000 he would completely pay off these claims, and then the building would be clear, and he could get this loan from some insurance company, and pay off your mortgage?

'*A.* That was his expectation; about that amount.

"*Q.* That it would take that amount to clear it; well, the mortgage that you finally got for the sum of $60,000 would make about $30,000 in addition to the amount that you were then liable on, would it not—it would be about $60,000?

"*A.* I suppose it would, yes, sir."

As above intimated, when referring to the amount of his securities that he then held, he meant the deed which he held for the title to certain real estate in Trenton, and in the county of Hunterdon, and his chattel mortgage.

As I have suggested, not a little light is thrown upon this subject by what Mr. Manning says when asked why he refused to endorse for Captain Holt after the release was signed, and the mortgage executed by Mr. Holt and his wife, and delivered to him; up to which time he had extended his liabilities to the amount of about $15,000. When asked why he stopped endorsing, he did not say that he had endorsed all he had agreed to; he did not say he had endorsed to the amount of money which was necessary to discharge the liens, in order to procure the release; nor did he make any reference to the liens, or to the amount that was due upon them, according to the agreement which was made, and by virtue of which the release was procured. He said:

"I don't remember just why I stopped; I suppose I did not want to endorse any more notes; I think the trouble was with General Rusling; I think there was a note that General Rusling was on; I think I consulted my counsel, and he advised me not to endorse any more."

This would show that it was not by virtue of any agreement that he stopped, but a mere matter of will. And again, when the question is renewed, he said:

"Well, really, I don't know; I think that is all the endorsements he wanted; that is my recollection; the reason that I did not, I presume, was on account of some trouble with General Rusling."

And, when the question was presented again from a different standpoint, he said:

"I don't remember as to that; all I remember is that I had endorsed about as much as I cared to endorse.

"*Q.* You endorsed only about $12,500?

"*A.* I had endorsed about enough; I did not care to go on any one man's paper any more than I was on it, for I might help General Rusling out."

He admits that when he accepted the $60,000 mortgage he thought Mr. Holt's circumstances were all right, but that in a few days' time he changed his opinion; he cannot say in how short a time it was changed, but says he had endorsed as much as he wished to. When further interrogated upon this subject, he said:

"The reason was—my intention was not to endorse beyond $30,000 to help Mr. Holt out when he had to pay a certain sum of money, in order to get the mechanics to sign off; then I endorsed beyond my first calculation; then I thought it was about time to stop; I did not know what hole I might get into."

Manning says, when speaking in reference to the release:

"My recollection is that he wanted $12,000 or $15,000 more, in order to pay off a certain amount of mechanics lien claims; I had no alternative, and I endorsed for him those notes."

When the question was put to him thus:

"*Q.* I understand you to say, and independent from what Mr. Holt said, that the understanding was that it would take $30,000. Now, what was said about its taking $30,000 more to get the building entirely released?

"*A.* I don't remember distinctly, but my recollections are that he wanted me to endorse to about $30,000, in order that he might get the building in shape until he could get the loan, that those notes might be paid.

"*Q.* Was it about $30,000 more that he wanted?

"*A.* The amount he wanted in the first place.

Katzenbach *v.* Holt.

" *Q* What about the after endorsements, whether you were to endorse $12,000 or $15,000 additional when you were to endorse for $30,000 ?

" *A.* He wanted from $12,000 to $15,000 to pay off these mechanics; that was the amount that I was to endorse; the renewals amounted to some $40,000.

" *Q* Did you stop about the 31st of January because you had endorsed all you had promised ?

" *A.* Not all that I had promised, but because I thought I had endorsed about enough.

" *Q.* Now, I ask again, what was the understanding between you and Captain Holt when you took that mortgage—as to any amount that you were to endorse for him ?

" *A.* I think not.

" *Q.* It was all left optional with you ?

" *A.* Yes, sir ; I think so.

" *Q.* And you held yourself at liberty to endorse for $1,000 or $2,000 as well as to stop at $12,000 or $15,000 ?

" *A.* I think so ; the mortgage was handed to me, signed by his wife ; I took it to my attorney, and he asked me if I intended to endorse to the amount of that mortgage ; I told him no ; he said there ought to be some writing made to show how much."

He added that he did not expect to get the liens released without providing for their payment.

General Rusling was offered as a witness by the complainants. He had a claim of $3,500 against Mr. Holt, and desired to have it secured on the morning of the 5th of February, thirteen days after the execution of the release ; and, five days after Mr. Manning had endorsed the last note, which increased his liability, he called upon Mr. Manning. He says Mr. Manning told him that he had received a mortgage from Mr. Holt for $60,000, and that he had agreed to endorse for him to the amount of $60,000, but that now he had endorsed about $30,000 or $40,000 and was afraid to go any further, and would not go any further. General Rusling urged him to endorse Mr. Holt's note for him, but he refused to do so. This statement of General Rusling is positively denied by Mr. Manning, although he admits that the mortgage was spoken of by him and General Rusling, and he admits that General Rusling wanted to see the mortgage, and that he told him that he could not see it, as he had left it at the bank ; but that he said he might see it if Mr. Whitehead, who had it, would allow him ; and he says that he wanted to discover

whether or not he (General Rusling) was secured by that mortgage, as he said he understood he was; and, when again interrogated whether or not anything had been said between him and General Rusling about the amount of his endorsements, he says:

"There might have been; I don't remember distinctly about that; it has been a good while, and I have forgotten the most part of it."

And when asked if he had not just stated that he distinctly recollected telling him that he endorsed enough, and would not endorse any more, he says it might have been so.

As in the former case, the preponderance of the testimony is that Mr. Manning promised Mr. Holt to endorse for him to an amount equal to the lien claims, if not to the sum of $30,000. Indeed, I cannot read Mr. Manning's evidence and draw any other inference. But, besides what already appears, there is another circumstance of no small moment. I refer to the advantage obtained by Mr. Manning by this transaction. He was liable for Mr. Holt, as is claimed, to the extent of $29,000, but, if I understand Mr. Holt's evidence on this head, not more than $25,000, for it seems the additional endorsements made the whole $40,400. But suppose it to be the former. Then, prior to the releases, there were over $25,000 (the sum total of mechanics liens) ahead of Mr. Manning's mortgage which he then held. So that, by getting these liens removed and taking a new mortgage for $60,000, including the $29,000, he greatly appreciated the value of his $29,000 claim. Before the release the mechanics liens of $25,000, and Mr. Manning's mortgage of $29,000, aggregated $54,000, whereas, after the release and the new mortgage for $60,000, Mr. Manning's liability does not exceed $44,400, and, according to Mr. Whitehead's testimony, only $40,400. So that, from this standpoint, Mr. Manning brings his entire claim (as it now stands) from $10,000 to $14,000 nearer home than it was before. Could he not well afford to say to Mr. Holt, "If you can thus promote my claim I will endorse for you?" Is it a thing incredible that a shrewd business man should take that view of the situation? Surely this does not

tax the belief so greatly as to admit that the complainants surrendered an unquestioned lien upon a simple promise.

Hence, from Mr. Manning's own statements, and from the circumstance that he offered other reasons for not endorsing more for Mr. Holt than that he had only promised to the amount required by way of cash to the amount of book accounts to secure the discharge of the liens, and to the circumstance that he consulted his counsel respecting it, and also to the benefit, as shown, to himself, I am led to the conclusion that Mr. Manning cannot, in equity, be permitted to plead such release, and ought to be enjoined from doing so at law. If such promises can be enforced affirmatively by third persons, most assuredly they may be negatively. *Joslin* v. *New Jersey Car Spring Co.*, 7 *Vr.* 141; *Pruden* v. *Williams*, 11 C. E. Gr. 210; *Coster* v. *Mayor*, 43 N. Y. 399; *Barker* v. *Bradley*, 42 N. Y. 316; *Kelly* v. *Roberts*, 40 N. Y. 432; *Hutchings* v. *Miner*, 46 N. Y. 456, 460; *Neilson* v. *Blight*, 1 Johns. Cas. 205; *Glen* v. *Hope Mutual Ins. Co.*, 56 N. Y. 379; *Todd* v. *Weber*, 95 N. Y. 181.

But again. The First National Bank being a holder, by assignment, of this bond and mortgage, the inquiry is, What are its relations to the parties, and what are its rights as such holder? Can the bank, under the circumstances of this case, be permitted to set up, by way of plea, and to offer in evidence, the release? It is not disputed but that Mr. Stull inquired of Mr. Whitehead, cashier of the bank, and that Mr. Katzenbach inquired of Mr. Dunn, the president of the bank, respecting the standing of Mr. Holt, and informed them of the object of such inquiry by stating to them, with some particularity, what Mr. Holt had applied to them for, and why they called upon them for information. Although in the details Mr. Whitehead and Mr. Stull do not agree, nor do Mr. Dunn and Mr. Katzenbach, yet, in my judgment, in statements that are essential there is but little conflict.

At that time Mr. Holt was indebted to the bank over $20,000, perhaps over $24,000, with Mr. Manning's endorsements, and this fact was not disclosed to either Stull or Katzenbach. And, as I understand the testimony of both Mr. Dunn and Mr.

Whitehead, they both then knew that Mr. Holt was to some extent embarrassed.   Mr. Dunn said:

" I had an impression that Alex. Manning was about to assist W. D. Holt in some manner; I knew that Holt was in financial difficulties, and I understood in some way, perhaps by Mr. Katzenbach, that morning or previous; I have no doubt I knew something about it previously, and yet I cannot say definitely at all."

And again, when asked if he recollected complainants' saying anything about releasing their claim, he said:

" I recollect that he spoke to me about it, and he asked my opinion as I would give it in a careless way, just as people often come in and talk to bank officers; my recollection is that I stepped out of my room into the part where customers have access and asked him some questions, and I told him what I thought;   *   *   *   he came in and told me how they were circumstanced; that W. D. Holt owed the firm a considerable amount of money, and he asked them to sign a paper of release, in order that he might make the arrangement with Mr. Manning to raise the money if he needed it; to raise this money; and he asked me what did I think, whether they would be safe in signing the release; he asked me what was my opinion; my recollection is that I said that I thought W. D. Holt would fulfill his agreement with them; if he said he would pay them out of the money he was likely to raise through Alex. V. Manning, my opinion was that he would do it."

Mr. Whitehead says:

" I recollect Mr. Stull calling upon me and making inquiries; it was about the time Mr. Holt's difficulties were culminating; sometime in January or February, probably; my recollection is that he came in to make some inquiry about Mr. Holt's standing and condition; Mr. Holt had asked him, or had asked the firm, to release their lien claim, and he wanted to act intelligently, and to get what information he could in regard to it; I don't recollect the exact conversation, but the purport of it, I think, was that, with the loan they had assented to make Mr. Holt, he would be able to carry out what he had promised to do in those matters."

This loan, he says, which they had assented to make, was one of considerable amount.   He says:

" I felt, at that time, with the assistance Mr. Holt would receive, that he would be able to pull through, and I may have said so to Mr. Stull—probably I did."

Katzenbach *v.* Holt.

These frank and full statements make the path of duty perfectly plain under the law. It was their duty to make known to Katzenbach and Stull the whole truth, or to preserve absolute silence. " In the eye of the law they perpetrated a wrong upon the complainants, and can claim no benefits from the transaction." *Hill* v. *Perrott, 3 Taunt. 274; Corking* v. *Jarrard, 1 Camp. 37; Clarke* v. *Shee, Cowp. 197; Addison on Torts p. 1008 § 1178; Evans* v. *Bicknell, 6 Ves. 174; Clifford* v. *Brooke, 13 Ves. 130; Upton* v. *Vail, 6 Johns. 181; Sooy* ads. *State, 10 Vr. 135; Bigelow on Fraud 60, 61 and cases cited; Kerr on Fraud and Mistake 67, 68, 69.*

But, if this were otherwise, the bank would be enjoined from setting up this release to an action on the lien claim, for the reason that it gave not the slightest consideration, which the law requires in such case. The bank did not take the assignment until after all the paper which Mr. Holt offered with Mr. Manning's endorsement had been discounted and placed to Mr. Holt's credit. The bank officers insist upon this with respect to time. The acknowledgement of the assignment had been dated February 4th, and this date erased. It was acknowledged in March. General Rusling swears that Mr. Whitehead showed him the bond and mortgage and assignment on February 5th, and that he read the assignment through. But if the assignment had then actually been made and delivered, though not acknowledged, it can make no difference, since, on January 31st, within eight days after the execution of the release, and within two days after the delivery of the mortgage to Mr. Manning, all of the advances had been made which the bank sought to secure by such assignment.

It was remarked, on the argument, that the allegations of the bill were not sufficiently definite to reach all the points embraced in the evidence, and especially with reference to Mr. Manning and the bank. As permission was asked, there may be an amendment to cover these points.

I conclude that the release cannot be pleaded or offered in evidence in the action at law on the lien claim of the complainants. The injunction heretofore issued should be made perpetual. This

view places the lien claim of complainants, as to all of the parties to this suit, just where it stood prior to the execution of the release..

I will so advise, with costs.